UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ANTHONY BACA,<br><br>    Plaintiff,<br><br>    v.<br><br>JONATHAN ANDERSON, et al.,<br><br>    Defendants. | Case No. 22-cv-02461-WHO<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 72 |

Defendants Jonathan Anderson, Michael Joseph Simonini, Brett Michael Weidner, and Zachary David Preuss move for summary judgment on plaintiffs' excessive force, unlawful seizure, First Amendment retaliation, and discrimination claims stemming from plaintiff David Baca's participation in and subsequent arrest during the May 29, 2020 protests in San Jose over the death of George Floyd. Dkt. No. 72. In opposition, Baca dropped his discrimination claim and all claims against defendant Preuss. Dkt. No. 77. Summary judgment is GRANTED to defendants on that claim and for that defendant. Summary judgment is also GRANTED for all claims asserted against defendant Simonini, who used objectively reasonable force in restraining Baca. There are material facts in dispute concerning the claims for excessive force against defendants Anderson and Weidner, unlawful seizure against Anderson, and retaliation against Anderson, and the motion is DENIED as to them.

**BACKGROUND**

On May 29, 2020, Baca joined protests in downtown San Jose over the death of George Floyd. To restore order, San Jose police officers in tactical battle dress uniforms gathered. They began moving up the street in a line across the street, occasionally using tear gas and rubber disks to disperse the protestors. Deposition Testimony of Michael Joseph Simonini (Ex. K to Gray Decl.; Ex. 3 to Leanos Decl.) at 38. More officers and police vehicles were behind the police line.

Baca was recording the police and their attempts to disperse the protestors on his cell phone. He did not throw any objects towards the officers or make any threats. He did walk towards the line of officers while holding his cellphone up in one hand, pointing at an officer and yelling "there is the racist cop."[1] Baca testified that he was approaching the line with his cellphone out in order to record Preuss's face and badge number. Deposition Transcript of David Baca (Exs. L & S to Gray Decl.; Ex. 1 to Leanos Decl.) at 121.

As Baca was within five to ten feet from the police line headed in Preuss's direction, Simonini fired rubber disks towards Baca, causing Baca to "change" direction and head for Simonini in order to record his face and badge. Baca Depo. Tr. at 129-130. Anderson believed that Baca – who is 5'11" and 230 pounds and who Anderson believed was agitated and "seemingly aggressive" – was going to assault Simonini. Deposition Transcript of Jonathan Anderson (Ex. J to Gray Decl.; Ex. 2 to Leanos Decl.) at 53, 55. The video evidence shows that no other protestors were walking towards the front line of the officers at that time, although some protestors on the side of the street were attempting to hold their ground as the line of officers attempted to move them back or get them to disperse. *See* Ex. I to Gray Decl. (SJY7 footage).

Baca admits that he was closer to the line than he realized, but still thinks he was five to six feet away. *Id*. at 121-122, 130. Without warning, according to Baca, Anderson stepped forward, swung his baton, and hit him. In his opposition, Baca asserts that Anderson's baton hit him in the throat or head area; the only evidence he cites is reference to still photos from officers' body worn cameras ("BWC") showing Anderson's baton being held at an angle a few feet away from Baca and then "one second later" a still photo of Baca's arm wrapped around the baton with the baton at Baca's neck. Oppo. at 3, Figures 1-3. Defendants contend that Anderson's baton hit Baca in the chest or upper torso and that when Baca's arm went over the baton, it slid up to Baca's

---

[1] In his opposition, Baca asserts that Simonini was "the racist cop" Baca believed was shooting rubber disks more frequently at protestors of color than protestors who were white, but he offers no evidence in support. Oppo. at 1. Defendants cite Baca's deposition to show that it was Preuss who Baca believed was "the racist cop" – the officer Baca initially intended to record and who was standing further down the police line than Simonini and Anderson – and not Simonini. The video evidence shows that Baca turned toward Simonini only after Simonini fired the disks that hit Baca in his legs when Baca was between five and ten feet from the police line. *See* Baca Depo. Tr. at 106-11, 127.

neck/head area.  They point to Baca's expert's report that the baton hit was to Baca's "upper chest/neck/face area. " Expert Report of Scott A. DeFoe, Ex. M to Gray Decl.  They also cite the expert's deposition testimony where he agrees that the video shows that Anderson hit Baca "in the chest area, and it slid up towards his neck and head area."  Defoe Depo. Tr. at 162, Ex. U to Gray Decl.

Defendants assert that Baca was walking towards the police line in an agitated and aggressive manner, and that once Baca turned toward Simonini, Anderson reasonably believed that Baca was going to assault Simonini.  Anderson Depo. Tr. at 53, 55, 75; Simonini Depo. Tr. at 66.  According to Anderson, he commanded Baca to move back, held his baton with both hands and applied force to Baca's chest. Anderson Depo. Tr. 54-56, 77; Simonini Depo. Tr. at 72.  Anderson did not intend to arrest Baca but intended to move him back to prevent an assault on Simonini.  Anderson Depo. Tr. at 53.

Baca testified that he was startled first by being hit in the legs by the rubber disks by Simonini and then from the baton strike from Anderson, so he involuntarily reacted by reaching for the baton and wrapping his arm or hand around it.  Baca Depo. Tr. at 137-139.  Simonini testified that in addition to grabbing the baton, Baca made a fist and attempted to hit Anderson. Simonini Depo. Tr. at 72.  Seeing that, Simonini decided to take Baca into custody and arrest him. Simonini Depo. Tr. at 75.  Simonini stepped forward, wrapped his forearms around Baca's head, and walked backwards dragging Baca behind the police line.  Simonini Depo. Tr. at 67-70, 72; Baca Depo. Tr. at 215. As Baca was being pulled across the line and then behind the line, Baca hit Simonini's head three times, causing significant bruising to Simonini's forehead and back of the head.  Simonini Depo. Tr. at 76, 80, 86.  Other officers including Weidner attempted to help subdue Baca, who admittedly continued to "resist" and swing his arms at the officers until Baca, Weidner, and other officers "fell" the ground and officers were able to put handcuffs on Baca. Baca Depo. Tr. 149; Weidner Depo. Tr. 57-58.

Weidner stated in his police report that while Baca "was on the ground, I punched Suspect Baca in the face. Based on my training and experience a punch to the face causes temporary pain and confusion allowing officers to gain control of the suspect's arms/hands to place him in hand

3

cuffs. The punch was ineffective as Suspect Baca continued to pull his arms away from officers and kick his legs." Gray Decl., Ex. Q.  In his deposition, Weidner "clarified" that he intended to punch Baca in the head but attempted to do so only "while we were still standing going to the ground," and not after Baca was on the ground.  Deposition Transcript of Brett Michael Weidner (Ex. 6 to Leanos Decl.; Ex. W to Gray Decl.) at 55-56, 58.

Baca claims that multiple other officers, including Weidner, punched, kicked, choked, and then slammed him to the ground after he was pulled behind the police line.  Baca Depo. Tr. 139-140.  He admits that during this time he was resisting, swinging his fists at the officers, because he was afraid for his life.  Baca Depo. Tr. at 140-141.  As Baca hit the ground, his kneecap was shattered (and required surgery); during his arrest he was forced to stand for an extended period of time in "grueling pain."  Baca Depo. Tr. at 169, 172.

Baca filed suit in April 2022, and following multiple rounds of motions to dismiss his remaining claims are: (1) a Fourth and Fourteenth Amendment excessive force claim under 42 U.S.C. §1983 against defendants Anderson, Simonini, Weidner, and Preuss; (2) a Fourth and Fourteenth Amendment claim for unlawful seizure and arrest under 42 U.S.C. §1983 against defendants Anderson, Simonini, Weidner, and Preuss; (3) a First and Fourteenth Amendment claim for interference with protected activity under 42 U.S.C. §1983 against Anderson, Simonini, Weidner, and Preuss; and (4) a Fourteenth Amendment claim for unlawful racial and ethnic discrimination under 42 U.S.C. §1983 against Anderson, Simonini, Weidner, and Preuss.

In opposition, Baca dropped his claims against Officer Preuss and drops his racial discrimination claim.  Oppo. at 1.  Summary judgment is granted to defendant Preuss and to all defendants on the discrimination claim.

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

1   persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has
2   made this showing, the burden then shifts to the party opposing summary judgment to identify
3   "specific facts showing there is a genuine issue for trial." *Id*. The party opposing summary
4   judgment must then present affirmative evidence from which a jury could return a verdict in that
5   party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

6   On summary judgment, the court draws all reasonable factual inferences in favor of the
7   non-movant. *Id*. at 255. In deciding a motion for summary judgment, "[c]redibility
8   determinations, the weighing of the evidence, and the drawing of legitimate inferences from the
9   facts are jury functions, not those of a judge." *Id*. However, conclusory and speculative testimony
10  does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See*
11  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). "If the nonmovant
12  bears the burden of persuasion on the ultimate issue, the movant may make its required initial
13  showing that there is no genuine dispute of material fact by demonstrating that 'there is an absence
14  of evidence to support the non-moving party's case.'" *Pac. Gulf Shipping Co. v. Vigorous*
15  *Shipping & Trading S.A.*, 992 F.3d 893, 897-98 (9th Cir. 2021) (citing Fed. R. Civ. Proc.
16  56(c)(1)(A) and *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)). "The burden
17  of production then shifts to the nonmovant, who must go beyond the pleadings and by her own
18  affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate
19  specific facts showing that there is a genuine issue for trial." *Id*. (internal quotation marks
20  omitted) (quoting *Celotex Corp.*, 477 U.S. at 324). "The nonmovant's burden of production at this
21  point 'is not a light one'—it 'must show more than the mere existence of a scintilla of evidence' or
22  'some "metaphysical doubt" as to the material facts at issue.'" *Id*. (quoting *Oracle Sec. Litig.*,
23  627 F.3d at 387). The nonmoving party "must come forth with evidence from which a jury could
24  reasonably render a verdict in the non-moving party's favor," assuming that "all justifiable
25  inferences are . . . drawn in its favor." *Id.* (quoting *Oracle Sec. Litig.*, 627 F.3d at 387).

# DISCUSSION

## I. EXCESSIVE FORCE

### A. Legal Standard

Under the Fourth Amendment, the amount of force used by law enforcement officers must be objectively reasonable when viewed in light of the totality of the circumstances. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). Determining the objective reasonableness of a particular use of force involves a three-step inquiry. *Graham v. Connor*, 490 U.S. 386, 396 (1989). After first assessing the type and amount of force inflicted, the court should determine the government's interests at stake by looking to "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape." *Maxwell v. Cty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012). These factors are non-exhaustive. *Id*. The Ninth Circuit has added "the availability of alternative methods of capturing or subduing a suspect." *Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005).

The final step is to balance the degree of force used against the government interest at stake to determine if the force used was "greater than is reasonable under the circumstance." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This determination is normally a question for the jury because it requires "resolution of disputed questions of fact and determinations of credibility, as well as on the drawing of inferences." *Santos*, 287 F.3d at 852 ("[E]xcessive force claims typically boil down to an evaluation of the various accounts of the same events. Thus, the circumstances surrounding those events may be critical to a jury's determination of where the truth lie."); *see Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (noting this determination is "ordinarily a question of fact for the jury"). Accordingly, "summary judgment should be granted sparingly." *Maxwell*, 697 F.3d at 951.

### B. Anderson Baton Strike

Baca contends that Anderson hit his neck or head with his baton, which according to Baca

1  (and not disputed by defendants) is a type of force that could inflict great or serious bodily injury.

2  Given that the most Baca could have been guilty of when he was struck was failure to disperse, a

3  misdemeanor, Baca contends that Anderson had no justification for using that level of force.

4  Anderson responds that Baca was acting aggressively or "assaultively" by approaching the line

5  with his right hand holding his camera up and shouting, and then abruptly changing direction

6  toward Simonini after Simonini had discharged rubber disks in front of Anderson.

7  Disputes of multiple material facts preclude granting summary judgment to Anderson on

8  the excessive force claim. Looking first to the nature of the force used,[2] there is a material dispute

9  whether – as Anderson contends – Anderson hit Baca in the chest in an effort to move him back

10  and whether it was Baca's grabbing of the baton that caused the baton to slide up to Baca's neck

11  or head area or whether – as Baca contends – Anderson stepped forward and intentionally hit Baca

12  in the neck or head. The video evidence is not clear. Both parties say that still photos from the

13  BWCs and the helicopter recording support their positions. But neither side has proffered expert

14  analysis of those recordings – for example, by slowing down the recordings, providing a frame-

15  by-frame analysis, or focusing on Baca's actions – to support their contentions.[3]

16  Prior to Baca's approach up to the edge of the police line, the only crime Baca was guilty

17  of was a misdemeanor failure to disperse. But it is conceivable that Anderson's use of force was

18  reasonable notwithstanding the non-severity of Baca's failure to disperse. *See Graham*, 490 U.S.

19  at 396 (looking at severity of the plaintiff's alleged crime). That is because Anderson believed

20  Baca was a threat; that belief is subject to a credibility determination by the jury. *See Graham*, 490

21  U.S. at 396 (considering the second and "most important" factor whether the plaintiff presented an

---

[2] *See Graham*, 490 U.S. at 396 (looking at severity of force).

[3] Whether Anderson gave Baca a warning before using the disputed level of force is also in dispute. This implicates the reasonableness of the force used. Baca claims that he heard no warning. Oppo. at 7. The BWC recordings indicate that an unidentified officer said "back up" but that warning was given at essentially the same time that Anderson moved forward with his baton. Reply at 7, 9 (citing Baca, White, and Anderson BWC recordings). I need not resolve this dispute, because while "warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test," *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001), then the disputes of material fact about the nature of the force Anderson used and the reasonable justification for the same preclude summary judgment under *Graham*.

1 immediate danger to the officers or others.).  Whether Anderson's concern about the threat posed
2 by Baca was objectively justified requires the jury to view the recordings, hear the evidence, and
3 weigh Anderson's credibility regarding his belief that Baca was acting aggressively and appeared
4 to be heading towards Simonini without an intent to stop in order to assault Simonini for shooting
5 the rubber disks.  Baca contends that he was not acting assaultively or walking aggressively, and
6 that by holding up his phone to record Simonini – even if he was closer to the line than he thought
7 – he presented no threat to Simonini that would justify any use of force.[4]

The assertions in this case are similar to those in *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678 (9th Cir. 2023).  There, the Ninth Circuit reversed in part a grant of summary judgment, explaining:

> Furthermore, while in some cases "abrupt movements or ... suspicious, furtive behavior" may "justifiably prompt[ ]" an officer to fear for their safety, *United States v. Brown*, 996 F.3d 998, 1007–08 (9th Cir. 2021) (citation and quotation marks omitted), officers merely stating they feared for their safety "is not enough; there must be objective factors to justify such a concern," *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). There are no such indicia here. William did not approach the Deputies, assault them, or attempt to fight them. *See Isayeva v. Sacramento Sheriff's Dept*., 872 F.3d 938, 948 (9th Cir. 2017) (officer's fear for their safety was reasonable where the detainee "engaged in a struggle with the deputies, physically resisting them, and ... tossing them around"). William merely breathed heavily, widened his eyes, and was upset at seeing Deputies forcefully restrain his wife. Moreover, as we noted previously, William was not suspected of committing any crime, much less a serious one which would give rise to an inference that he was armed.
> . . .
> the Deputies contend that William's large size compared to Deputies Bliss and Chhlang justified their use of force. While disparities in size are germane to a use of force inquiry, they are most relevant when they create a change in the status quo, leading to an actual need to employ greater force.

*Id*. at 696–97.

There are obvious material disputes here:  Did Baca's size and behavior (abruptly turning

---

[4] To argue that Anderson acted objectively reasonably towards Baca, defendants emphasized in their briefs and at oral argument that ten minutes prior to this encounter, it was announced over the radio that an officer had been punched and knocked unconscious by a protestor.  *See* Reply at 8.  There is no evidence that Anderson knew of this.  In any event, it would not establish as a matter of law that Anderson acted objectively reasonably.

8

towards Simonini and the other officers, unarmed but holding a cell phone up, where Baca was 5'11' and weighed 230 pounds and the officers were in battle dress uniform) justify Anderson's use of force? Was that use of force a push to the torso with a warning or a strike to Baca's neck or head without warning? These are questions for the jury to determine.

Summary judgment is denied on the excessive force claim against Anderson.

### C. Weidner Punch

In his initial police report, Weidner states that while Baca was on the ground, he punched Baca in the face in an attempt to get Baca to stop fighting and resisting the officers' attempt to arrest him. Baca contends that a punch to the head/face is excessive force, or at a minimum intermediate and unjustified force, especially if the subject is already on the ground when the punch (or attempted punch) occurs. Weidner attempted to back away from that admission in his deposition, saying that the officers and Baca were on their feet and headed to the ground when Weidner attempted to punch Baca in the face and landed a blow on the torso or upper chest (although admitting to aiming for the face). This creates a dispute of material fact.

Similarly, while Baca does not dispute that he was "resisting" officers for some period of time, including attempting to swing at or kick the officers because he was afraid for his life, both whether his fear was justified and proportionate and when he ceased resisting relative to the timing of Weidner's punch are likewise disputed material facts. *See Graham*, 490 U.S. at 396 (considering whether the plaintiff was actively resisting arrest); *see also Bernal*, 73 F.4th at 697 ("The Deputies [] contend that William resisted the Deputies' efforts to restrain him. When viewing the evidence in the light most favorable to William, we conclude this, at most, constitutes minimal resistance. William testified he did not hit any of the officers, although he did recall struggling against the Deputies [] . . . . even if William intentionally elbowed Deputy Chhlang, this resistance is not proportionate to the significant amount of force the Deputies used to restrain him. Accordingly, we weigh this factor slightly in favor of William.").

In their Reply (Dkt. No. 78 at 5, 10), defendants contend that the BWC recordings from Officers Jize and Weidner show that Weidner "essentially flails at Plaintiff with an open hand while the two men and other officers are falling to the ground," and Weidner ends up behind Baca,

9

not close to his face, so Weidner could not have punched Baca in the face or head at all. Reply at 5. The BWC recordings are not as clear to me as they purport to be to defendants. Absent expert or other analysis that identified on a frame-by-frame basis where Weidner was at specific times during the event, showing that Weidner could not have landed a punch on Baca's head/face when Baca was on the ground or otherwise was not resisting, I cannot grant summary judgment on the excessive force claim against Weidner.

### D. Simonini's Conduct

The result is different for Simonini. Baca does not dispute that Simonini saw – as supported by the video evidence – that once Anderson hit Baca with his baton, Baca wrapped his arm or hand around Anderson's baton *and* made a fist in an apparent attempt to strike Anderson. Whether or not Baca was acting from surprise or shock, whether his conduct was voluntary or involuntary, does not matter. What matters is what Simonini undisputedly saw and that – seeing those events unfold – he was objectively justified in moving to arrest Baca at that point and effectuating that arrest by locking his forearms around Baca's head and pulling him behind the police line in order to prevent the threat to Anderson or other officers from a then-resisting Baca. Baca cites no comparable cases to argue that Simonini's use of moderate force to remove the threat Baca represented was objectively unreasonable.

Instead, Baca relies on *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1164 (9th Cir. 2011). There, the panel "recognized that an officer's 'provocative conduct' can trigger an individual's 'limited right to offer reasonable resistance.' *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001)." Discussing "police conduct" that might be viewed by the plaintiff as "sufficiently provocative to trigger this limited right of resistance"[5] the *Young* court found that a jury "could easily conclude that Young's alleged conduct of 'moving' and

---

[5] In that case: plaintiff "was sitting on the curb eating his broccoli with his back turned to Wells when Wells began to pepper spray him, and the record does not suggest that Young was threatening Wells or the public in any way. *See Bryan v. MacPherson*, 630 F.3d 805, 832–33 (9th Cir.2010) (concluding suspect posed no immediate threat to officer where "[t]he facts suggest that [the suspect] was not even facing [the officer] when he was shot [with a taser].""). The record is thus clear and the parties do not dispute that no reasonable safety concern warranted Wells's use of pepper spray upon Young" and then the officer used "baton blows after Young stood up from the curb" when no cause shown. *Id*. at 1163.

10

'circling'—far from indicating any objective safety threat to [the officer]—was simply a reasonable response from an individual who was pepper sprayed from behind without warning while sitting on the sidewalk." That is a far cry from this case, where Baca grabbed Anderson's baton and tried to punch him. Simonini was objectively justified in seeing Baca as a threat to Anderson and using intermediate force in order to effectuate his arrest, no matter whether Baca was taken by surprise by Anderson's baton hit and resisting because he was afraid for his life as he claims.[6]

Summary judgment is GRANTED to Simonini.

### E. Qualified Immunity

Finally, defendants argue Baca has failed to meet his burden at summary judgment to show that Anderson was "on notice that he could not push an aggressive and agitated protestor back with a baton aimed at the protestor's chest, when the protestor posed a threat to a fellow officer and looked like he was about to assault the officer." Reply at 12. Similarly, defendants contend Weidner cannot be faulted for attempting to hit Baca in the head when Weidner saw multiple officers attempting to subdue the aggressive and wildly swinging Baca who presented a threat to the officers. *Id.*[7]

Qualified immunity cannot be resolved on this motion. There are numerous disputes of material fact whether the uses of force applied by Anderson and Weidner were objectively justified based on *Graham* factors. Qualified immunity hinges on the credibility of the officers' beliefs, meaning that objective reasonableness cannot be resolved on this motion.

If Anderson – as Baca contends – stepped forward and without warning hit Baca in the neck or head with his baton, not because Baca was a threat but because Baca was recording the

---

[6] Baca Depo. Tr. at 140 ("Q: But you felt that there were multiple police officers were trying to gain control over you? A: I only felt being thrown down to the ground and being choked out, yeah, that's what I felt."); *id* at 141 (admitting he was swing his fists at officers who were hitting Baca "all over" his body "'Cuz they were all swinging batons and fists at me . . . Because I was afraid for my life.").

[7] *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 698 (9th Cir. 2023) ("We make two inquiries in determining whether qualified immunity applies: first, did the Deputies violate a constitutional right, and if so, was that right 'clearly established' at the time of the misconduct?").

officers and had called one of them a racist, Anderson would not be entitled to qualified immunity. *See Bernal*, 73 F.4th at 698-99 ("Viewing the evidence in the light most favorable to the Bernals, William never reached into his bag, and instead yelled at the Deputies to stop assaulting his wife and attempted to record the Deputies. Recording and verbally challenging police are not only legal actions but are protected by the First Amendment."). And given the disputes about whether Weidner punched Baca in the face or head and whether that punch occurred while Baca was on the ground and no longer resisting or resisting as much, summary judgment cannot be granted to Weidner based on qualified immunity. This is true even though the video evidence clearly shows, and Baca admits, that Baca resisted and continued to throw punches and struggle while and after Simonini pulled him behind the police line. *See, e.g., O'Doan v. Sanford*, 991 F.3d 1027, 1033, 1037 (9th Cir. 2021) (explaining the question for qualified immunity is whether "clearly established law prohibited" the officer "from using the degree of force that he did in the specific circumstances that the officers confronted" and finding that the third *Graham* factor weighs in favor of qualified immunity where the suspect was "combative" while repeatedly resisting officer commands).

## II. UNLAWFUL SEIZURE BY ANDERSON

Defendants also move for summary judgment on Baca's Fourth Amendment "unlawful seizure" claim.

### A. Legal Standard

The Fourth Amendment protects against unreasonable seizures. *Torres v. Madrid*, 592 U.S. 306, 311 (2021). The Supreme Court has repeatedly held that "whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Brower v. County of Inyo*, 489 U.S. 593, 595 (1989) (internal quotations omitted). "The appropriate inquiry is whether the challenged conduct objectively manifests an intent to restrain. *Michigan v. Chesternut*, 486 U.S. 567, 574, 108 S.Ct. 1975, 100 L.Ed.2d 565. This test does not depend on either the subjective motivation of the officer or the subjective perception of the suspect. Finally, a seizure by force lasts only as long as the application of force unless the suspect submits." *Torres*, 592 U.S. at 317. Once a seizure is found, the next question is whether it was objectively reasonable. *See Seidner v. de Vries*, 39

F.4th 591, 596 (9th Cir. 2022). "In assessing whether an officer's actions were objectively reasonable, we consider: '(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion.'" *Id*. (*quoting Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022)).

### B.     Seizure

Defendants argue that no seizure occurred because Anderson's baton strike was a mere attempt to repel and push Baca back from the police line. They point to Anderson's deposition testimony that at the time he used his baton, he did not intend to seize or arrest Baca but was acting to protect Simonini. Anderson Depo. Tr. at 53, 74-76.[8] Anderson's subjective intent is irrelevant, however. The question is whether Anderson's conduct "objectively manifests and intent to restrain." *Torres*, *supra*.

Baca argues that the slightest use of force can constitute a seizure. *See California v. Hodari D*., 499 U.S. 621, 624 (1991) ("to constitute an arrest, however—the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient."). He contends that in addition to the baton strike, additional objective evidence of an intent to seize is that Anderson did not object to and simply watched the other officers drag Baca behind the line and then attempt to subdue and bring him down to the ground after the baton hit. Baca also argues that he was not free to leave or given the opportunity to move back from the police line after the baton strike.

Once the baton strike occurred, however, it is undisputed that Baca grabbed the baton and made a fist. Seeing that conduct (which we assume was involuntary, construing the evidence in

---

[8] Defendants also point to the video evidence that Anderson did issue a warning to "get back" before the baton strike as evidence of Anderson's objective intent to push Baca back and not seize him. As discussed above, the audio from the various recordings provided to the Court – without expert or frame-by-frame analysis – do not clearly demonstrate that it was Anderson who issued a warning to Baca to back up, that the warning was issued before the baton strike, or that Baca could have heard the warning in time to react before the baton strike.

the light most favorable to Baca), Simonini was objectively justified in moving to seize Baca. That Anderson, at that point, did not attempt to disrupt the seizure is irrelevant.

The only point of possibly unreasonable seizure then is the initial baton strike. Viewing the evidence in the light most favorable to Baca, and considering that the "back up" warning given by an officer (perhaps Anderson) occurred at essentially the same time as the baton strike, the question remains whether the baton strike was aimed at and hit Baca on his head or neck, as Baca contends. For the same reasons that summary judgment cannot be granted to Anderson on the excessive force claim, it cannot be granted based on the unlawful seizure claim.

### III.    VIOLATION OF FIRST & FOURTEENTH AMENDMENT RIGHT TO PROTEST

To prove a First Amendment retaliation claim, plaintiffs "are required to show that they were engaged in a constitutionally protected activity, the [] Defendants' actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and the protected activity was a substantial or motivating factor in the [] Defendants' conduct." *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). Defendants argue that Baca cannot make that showing because it is undisputed that Baca does not believe that any defendants' conduct was motivated by his "racist cop" speech or his attempt to record Simonini or other officers' faces and badge numbers.

Defendants point to Baca's deposition testimony:

> Q: Do you believe that any police officer intended to target you in particulate for the message you were expressing at the protest?
> [objection, speculation]
> A: No.
> . . .
> Q: So you don't have a belief today that a police officer singled you out because of any of your expressive activity; is that correct?
> A: Yes, correct.

Baca Depo. Tr. at 152. Defendants also cite Baca's deposition testimony that he was initially heading towards and pointing out Preuss who was standing further to the right of Anderson as "the racist cop," not Simonini who was standing to Anderson's left. The video evidence shows that Baca abruptly turned towards Simonini only after Simonini fired rubber disks into the ground that hit Baca in the legs. Accordingly, say the defendants, the Anderson baton hit that led to

14

Simonini's attempt to arrest Baca was not related to Baca's "racist cop" speech or his recording of the officers. Finally, defendants note that the recordings show that numerous other protestors were recording the police immediately before, during, and after the incident with Baca, but there is no evidence that any officer instructed anyone to stop recording or otherwise took any acts against protestors because they were recording.

In opposition, Baca does not address his deposition testimony. Instead, he argues that a reasonable juror could nonetheless find – given that he was unarmed as he approached the police line and held his cell phone in an outstretched hand evidencing a clear intent to record Simonini's face and badge number – that Anderson's decision to step out of the line and strike Baca was unrelated to any threat he posed to Simonini and instead was in response to Baca's "racist cop" accusation and attempt to record Simonini's face and badge. *See, e.g.,* Baca Depo. Tr. at 115 "(I can't say whether that guy harmed me, if it was 'cuz my race or because I was filming."). Similarly, Baca argues that Simonini's seizure of Baca could likewise be found to be in retaliation for Baca's protected speech and attempt to identify Simonini.

While another close call, viewing the evidence in the light most favorable to Baca, the First Amendment retaliation claim survives against Anderson. The deposition so heavily relied on by defendants does not define "expressive conduct" or explore what that term of art means to Baca. Later in his deposition, Baca admits that he does not know if he was hit by Anderson because of his race or because he was filming. The jury will need to assess the credibility of Anderson and resolve the disputes regarding the nature of the force used against Baca in light of the circumstances surrounding that use of force to determine whether Anderson used his baton against Baca in part because of Baca's speech or recording of officers.

As noted above, however, the undisputed facts show that Baca grabbed Anderson's baton and made a fist (even if involuntary); that conduct and the threat it posed to Anderson was why Simonini moved to seize Baca and pulled him back through the police line. Baca presents no expert testimony or other direct or circumstantial evidence to support the inference that Baca's expressive conduct prior to grabbing Anderson's baton and making a fist motivated Simonini's response. *See Index Newspapers LLC*, 977 F.3d at 828 (likelihood of success on First Amendment

retaliation claim shown where there were numerous instances of officers targeting members of the press and expert testimony demonstrated the tactics were targeting the press and not appropriate crowd-control tactics). Accordingly, Simonini is entitled to summary judgment on this claim.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED on the unopposed racial discrimination claim and on the claims against Preuss and Simonini. It is DENIED on the excessive force, unreasonable seizure, and First Amendment claims against Anderson and DENIED on the excessive force claim against Weidner.

**IT IS SO ORDERED.**

Dated: June 6, 2024

William H. Orrick
United States District Judge